# United States District Court

**CENTRAL** _____ **DISTRICT OF** _____ **CALIFORNIA** _____

**In the Matter of the Seizure of**
(Address or Brief description of property or premises to be seized)

**UP TO $117,000 IN TD AMERITRADE ACCOUNT NUMBER 279-90630**

**APPLICATION AND AFFIDAVIT FOR A SEIZURE WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

**CASE NO:** 2:21-MJ-00949

**I, Geffrey Clark,** being duly sworn depose and say:

**I am a Special Agent with the INTERNAL REVENUE SERVICE - CRIMINAL INVESTIGATION, and have reason to believe that in the  CENTRAL  District of _____ CALIFORNIA _____ here is now concealed a certain person or property, namely**

(describe the person or property to be seized)

Up To $117,000 in TD Ameritrade Account Number 279-90630

**which is** (state one or more bases for seizure under United States Code)

subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), (b), §§ 982(a)(7), (b)(1), and § 984, and 21 U.S.C. § 853(f)

**concerning a violation of Title  18   United States Code, Section(s)**  § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud), both of which are specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7) and 1957 or are traceable to such property, which is a specified unlawful activity as defined in 18 U.S.C. § 1961(1)(B).  To the extent that the Subject Funds are not the actual monies traceable to or involved in the illegal activities identified herein, the government alleges that these funds are identical property found in the same subject account(s) as the property traceable to or involved in the illegal activities, rendering them subject to forfeiture pursuant to 18 U.S.C. § 984.

**The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:**
**Continued on the attached sheet and made a part hereof.      X  Yes __  No**

_____
**Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone**

**Sworn to before me in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone**

_____
**Date**

Los Angeles, California
**City and State**

_____
**Hon. , Jacqueline Chooljian, U. S. Magistrate Judge**
**Name and Title of Judicial Officer**

_____
**Signature of Judicial Officer**

AUSA Brent Whittlesey:smb

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS

### I.

### INTRODUCTION

I, Geffrey Clark, being duly sworn, declare as follows:

1.    I am a Special Agent ("SA") with the Internal Revenue Service – Criminal Investigation ("IRS-CI") in the Los Angeles Field Office and have been so employed for 20 years.  As part of my training as an SA, I attended the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in criminal and financial investigative techniques with an emphasis in accounting and criminal tax law.  My training included courses in law enforcement techniques, federal criminal statutes, criminal investigations, execution of search warrants, financial investigative techniques, and legal principles and statutes representing criminal violations of the United States Code as enumerated in Titles 18, 26, and 31.  Prior to becoming a Special Agent, I received a Bachelor of Science degree in Criminal Justice Science from Illinois State University.  I have personally conducted and assisted in investigations of criminal violations of the Internal Revenue Laws, Bank Secrecy Act, Money Laundering Control Act, identity theft, and wire and mail fraud.  These investigations have

involved the use of physical surveillance; the use of cooperating witnesses; undercover operations; and the preparation and execution of search and arrest warrants.

2.   The facts set forth in this affidavit are based on personal knowledge I gained from my participation in this investigation, my training and experience, documents and records that were collected and reviewed in the course of this investigation, information that was obtained from interviewed witnesses, and information gathered by other law enforcement officers.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.

## PURPOSE OF AFFIDAVIT

3.   This affidavit is made in support of an application for warrants to seize the following:

a.   Up to $355,000 on deposit in JPMorgan Chase ("Chase") checking account number 684555268, held in the name of Turing Info Solutions, Inc. ("Subject Account 1");

      b.   Up to $59,000 on deposit in Chase checking account number 683386822, held in the name of Iuliia Zhadko ("Subject Account 2");

      c.   Up to $117,000 on deposit in TD Ameritrade ("Ameritrade") account number 279-903630, held in the name of Iuliia Zhadko ("Subject Account 3"); and

      d.   Up to $3,000 on deposit in Chase savings account number 3897572757, held in the name of Turing Info Solutions, Inc. ("Subject Account 4"), (collectively referred to as the "Subject Funds" or the "Subject Accounts").

      4.   The Subject Funds are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and (b) because there is probable cause to believe that said funds constitute or were derived from proceeds traceable to one or more violations of 18 U.S.C. §§ 1343 (Wire Fraud) and 1344 (Bank Fraud), both of which are specified unlawful activities as defined in 18 U.S.C. § 1956(c)(7). Specifically, probable cause exists that the Subject Funds represent proceeds from a fraud scheme by which RICHARD AYVAZYAN ("R. AYVAZYAN"), MARIETTA TERABELIAN ("TERABELIAN"), ARTHUR AYVAZYAN ("A. AYVAZYAN"), TAMARA DADYAN ("DADYAN"), and others known and unknown, knowingly submitted or caused others to submit fraudulent loan

applications to various lenders, including federally
insured financial institutions, and the Small Business
Administration ("SBA"), in an attempt to obtain funds
authorized by the Coronavirus Aid, Relief, and Economic
Security ("CARES") Act.  Based on these fraudulent loan
applications, funds were then wired to numerous accounts
and deposited, either directly or indirectly through
transfers, into the Subject Accounts associated with R.
AYVAZYAN.

5.   To the extent that the Subject Funds are not the
actual monies traceable to or involved in the illegal
activities identified herein, there is probable cause to
believe that said funds are identical property found in the
same account(s) as the property involved in the illegal
activities, rendering them subject to forfeiture pursuant
to 18 U.S.C. § 984.

6.   In addition, the Subject Funds are subject to
seizure and forfeiture to the United States pursuant to 18
U.S.C. § 982(a)(7) and (b)(1), and 21 U.S.C. § 853(f),
because there is probable cause to believe that the Subject
Funds would, in the event of conviction on the alleged
underlying wire fraud and bank fraud offenses, be subject
to criminal forfeiture, and an order under 21 U.S.C. §
853(e) (providing for restraining orders and injunctions)

would not be sufficient to assure the availability of the property for forfeiture.

## III.

### BACKGROUND

7.     Based on my training and experience, review of publicly available information, and discussions with other law enforcement agents, I have learned the following regarding the loans at issue.

**A.     THE PAYCHECK PROTECTION PROGRAM ("PPP")**

8.     The CARES Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP. In or around April 2020, Congress authorized over $300 billion in additional PPP funding, and in December 2020, Congress authorized another $294 billion in additional funding.

9.     In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, signed by an authorized representative of the business.  The PPP loan

application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its:  (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

10.  A PPP loan application must be processed by a participating lender.  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan. Specifically, the lenders enter the PPP application information into the SBA E-Tran system.  The E-Tran computer server is located in Herndon, Virginia.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA.  The SBA is a United States government agency based in Washington, D.C.

11.  PPP loan proceeds must be used by the business on certain permissible expenses, *e.g.*, payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

**B.    THE ECONOMIC INJURY DISASTER LOAN ("EIDL") PROGRAM**

12.  The EIDL program is an SBA program that provides low-interest financing to small businesses, renters, and homeowners in regions affected by declared disasters.

13.  The CARES Act authorized the SBA to provide EIDLs of up to $2 million to eligible small businesses experiencing substantial financial disruption due to the COVID-19 pandemic.  In addition, the CARES Act authorized the SBA to issue advances of up to $10,000 to small businesses within three days of applying for an EIDL.  The amount of the advance is determined by the number of employees the applicant certifies having.  The advances do not have to be repaid.

14.  In order to obtain an EIDL and advance, a qualifying business must submit an application to the SBA and provide information about its operations, such as the

number of employees, gross revenues for the 12-month period preceding the disaster, and cost of goods sold in the 12-month period preceding the disaster.  In the case of EIDLs for COVID-19 relief, the 12-month period was that preceding January 31, 2020.  The applicant must also certify that all of the information in the application is true and correct to the best of the applicant's knowledge.

15.  EIDL applications are submitted directly to the SBA and processed by the agency with support from a government contractor.  The amount of the loan, if the application is approved, is determined based, in part, on the information provided by the application about employment, revenue, and cost of goods sold, as described above.  Any funds issued under an EIDL or advance are issued directly by the SBA.  EIDL funds can be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.  If the applicant also obtains a loan under the PPP, the EIDL funds cannot be used for the same purpose as the PPP funds.

**IV.**

**FACTS SUPPORTING PROBABLE CAUSE FOR SEIZURE**

**A.    SUMMARY OF SCHEME**

16.  Beginning in or around March 2020 and continuing through at least in or around August 2020, R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, DADYAN and others known and unknown, knowingly submitted or caused others to submit fraudulent loan applications in the names of numerous business entities to various lenders, including federally insured financial institutions, and the SBA, and in turn, received proceeds from disaster loans authorized by the CARES Act.  Among other things, the fraudulent loan applications included material misrepresentations about the applicant's payroll, payroll taxes, number of employees, and income.  Once the funds were received, in some instances, disaster loan proceeds were used to purchase residential properties.  Using disaster loan proceeds as part of a down payment on a residence for an individual's personal benefit is also fraudulent and violates the requirements for the PPP and EIDL.

**B.   Prior Seizure Warrants**

17.  In order to recover portions of the proceeds of the scheme, on February 2, 2021, the government previously applied for and secured warrants from the Honorable Magistrate Judge John E. McDermott to seize fraudulent loan proceeds in accounts different from the current Subject Accounts, Cases 2:20-MJ-05667 and 2:21-MJ-319.   Those

seized funds represented fraudulent loan proceeds obtained in the names of business entities and individuals different from the current Subject Accounts.

C.   **NOVEMBER 17, 2020 INDICTMENT**

18.   On November 17, 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN were indicted by a federal grand jury in the Central District of California for violations of 18 U.S.C. § 1349 (conspiracy to commit bank fraud and wire fraud); 18 U.S.C. § 1343 (wire fraud); and 18 U.S.C. § 1344 (bank fraud), in the United States v. Ayvazyan et al, No. 2:20-CR-00579-SVW.  R. AYVAZYAN was also indicted for violation of 18 U.S.C. § 1028A (aggravated identity theft).  According to the indictment, beginning no later than in or around March 2020 and continuing until at least in or around July 2020, in Los Angeles County, within the Central District of California, and elsewhere, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, and other known and unknown conspirators, carried out the objects of the conspiracy, in substance, in the following manner:

a.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, used and caused to be used, stolen, fictitious, or

synthetic identities of individuals to submit fraudulent applications for PPP and EIDL loans;

b.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use, and cause to be used, stolen, fictitious, and synthetic business names to submit fraudulent applications for PPP and EIDL loans;

c.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would make, and cause to be made, false statements to the SBA and financial institutions in connection with the fraudulent applications for PPP and EIDL loans, including false representations regarding the number of employees to whom the companies had paid wages and false certifications that the loans would be used for permissible business purposes;

d.   Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would electronically submit, and cause to be submitted, false and fictitious documents to the SBA and financial institutions in support of the fraudulent PPP and EIDL loan applications, including false or fictitious tax documents, payroll records, bank records, and identification documents;

e.    Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would direct that PPP and EIDL loan proceeds be deposited into bank accounts that defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators controlled; and

f.    Defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, would use the fraudulently-obtained PPP and EIDL loan proceeds for their own personal benefit and for the benefit of their coconspirators, including for expenses prohibited under the requirements of the PPP and EIDL programs, such as the purchase of residential properties in Tarzana, California, and Glendale, California.

19.  As part of the conspiracy, between in or around March 2020 and in or around July 2020, defendants R. AYVAZYAN, TERABELIAN, A. AYVAZYAN, and DADYAN, together with other coconspirators, submitted and caused the submission of at least 35 fraudulent PPP and EIDL loan applications seeking a total of at least $5.6 million in PPP and EIDL proceeds from the SBA and financial institutions and received a total of at least $4.6 million in PPP and EIDL loan proceeds from the SBA and financial institutions.

D.   **TURING INFO SOLUTIONS, INC. ("TURING") FRAUDULENT PPP LOAN APPLICATION**

20.   On or about July 31, 2020, Turing applied for a PPP loan through Newtek Finance ("Newtek").  Turing stated on its PPP loan application that Iuliia Zhadko ("Zhadko") was the loan applicant and sole business owner.  On or about August 21, 2020, Newtek approved the PPP loan and disbursed $384,100 to Turing's JPMorgan Chase account ending in x5268 (Subject Account 1).

21.   The government's investigation revealed that Turing's PPP loan application contained numerous false and fraudulent representations.  For example:

a.   Turing provided to Newtek as supporting documentation a copy of a California state driver's license ("CADL") purported to be for Zhadko, bearing number C8924483.  I reviewed records from the California Department of Motor Vehicles ("CA DMV") and learned that this driver's license number does not exist and there is no record of Zhadko in CA DMV records.  As explained below, I believe that Zhadko is a synthetic identity utilized to mask the true identity of the PPP loan applicant.

b.   As a result of a search of R. AYVAZYAN's phone, I identified a photograph taken of an identical CADL in the name of Iuliia Zhadko bearing the driver's license

number C8924483 and a social security card in the name of
Iuliia Zhadko, 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, that had been provided to
Newtek.  Additionally, I viewed a photo of a handwritten
paper bearing the identical information contained on the
Turing PPP loan application, including but not limited to
address, phone number, email address, EIN 85-2214789,
notation Newtek, and the date 08/15/2015 (the date on the
application which indicates the date that the business was
established).  I believe that this indicates that R.
AYVAZYAN has control over accounts in the name of Turing
and Zhadko.

22.  In support of the PPP loan application, IRS Forms
1120-S and 940, for the tax year 2019, in the name of
Turing, were submitted.  Each of these forms indicated that
Jack Runyan of Runyan Tax Service, Inc. was the preparer of
the forms.  On February 9, 2021, I interviewed Jack Runyan
and he stated that Turing and Zhadko have never been his
clients and he did not prepare or sign the forms as the
preparer, as indicated on the forms.  Furthermore, the IRS
confirmed that Turing has never filed any IRS Forms 1120-S,
940s or 941s, which would be evidence of a business having
lawfully reported payroll and deposited employment taxes.

23.  On the PPP loan application, Turing fraudulently
misrepresented payroll information to Newtek by inflating

employee headcounts.  The PPP loan application represented to Newtek that Turing was registered in California as an S-Corporation with 36 employees.  However, in support of its EIDL application, Turing indicated that it had 11 employees.

24.  I believe that Turing supported its fraudulent PPP loan application by providing payroll reports prepared using Gusto software.  Gusto is a payroll processing software utilized by businesses to prepare payroll, payroll taxes and payroll reports.  I know that A. AYVAZYAN, DADYAN, TERABELIAN, and R. AYVAZYAN provided similar fraudulent Gusto reports in other fraudulent PPP loan applications involving entities previously subject to executed seizure warrants 2:20-MJ-05667 and 2:21-MJ-319. Therefore, I believe that Turing, as operated by A. AYVAZYAN, DADYAN, TERABELIAN, and R. AYVAZYAN, engaged in the same or similar pattern of document fraud. Furthermore, Gusto confirmed that Turing was not a client of theirs and thus could not have generated any payroll reports from their payroll software platform.

E.  **TURING FRAUDULENT EIDL LOAN APPLICATION**

25.  On or about July 29, 2020, Turing applied for a $150,000 SBA EIDL loan.  Turing stated on its EIDL loan application that Zhadko was the sole owner of Turing.  On

or about August 9, 2020, the SBA approved the EIDL loan and electronically transferred $149,900 to Turing's JPMorgan Chase account ending in x5268 (Subject Account 1).

26.   The government's investigation revealed that Turing's EIDL loan application contained numerous false and fraudulent representations.  For example:

a.   Turing stated in its EIDL loan application that it has been in operation since August 15, 2015 and has been operating in the State of California.  I searched the California Secretary of State's publicly available business entity registration records and determined that prior to July 11, 2020, Pavan Gajjala ("Gajjala") was the sole owner of Turing.  On July 16, 2020, an electronic Form S-200 was filed with the California Secretary of State which indicated that Zhadko held all of the corporate positions and the corporate address had changed.  On December 29, 2020, an electronic Form S-200 was filed which changed all of the corporate positions back to Gajjala, as well as again changing the address.

b.   Turing stated in its EIDL loan application that it employed 11 individuals for the 12 months leading up to January 31, 2020 (the PPP Newtek loan application indicated 36 employees).  I know that employers need a valid EIN to properly report employee payments to the IRS.

Turing claimed on its EIDL loan application to have the Employer Identification Number ("EIN") of 85-2214789.  The IRS confirmed that there were no Forms 1120-S, 940 or 941 filed with the IRS, which would evidence a business having lawfully reported wages paid and deposited employment taxes under the EIN 85-2214789.

c.   As a result of a search of R. AYVAZYAN's phone, I identified a photograph taken of an identical CADL in the name of Iuliia Zhadko bearing the driver's license number C8924483 and a social security card in the name of Iuliia Zhadko, 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, that had been submitted to the SBA.  Additionally, I viewed a photo of a handwritten paper bearing the identical information contained on the Turing EIDL loan application, including but not limited to address, phone number, email address, EIN 85-2214789, notation SBA, and the date 08/15/2015 (the date on the application which indicates the date that the business was established), and APP # 3312192336 (the SBA application number, which matches SBA records for this application).  I believe that this indicates that R. AYVAZYAN has control over accounts in the name of Turing and Zhadko.

**FRAUDULENT PPP AND EIDL FUNDS TRANSFERRED TO AND AMONG SUBJECT ACCOUNT 1, SUBJECT ACCOUNT 2, AND SUBJECT ACCOUNT 3**

**Fraudulent Loan Proceeds Deposited into Subject Account 1**

27.   Investigators obtained and reviewed records from Chase for Subject Account 1 and learned that this account was opened on or about July 29, 2020, the same day that Turing submitted the application for the EIDL loan.  The only signatory on the account was Zhadko.  The account was opened with an initial deposit of $100.  Subsequently, on July 30, 2020, a check for $5,000 from Nazar Terabelian[1] ("N. Terabelian") was deposited into this account.

28.   On or about August 12, 2020, proceeds from the EIDL loan of $149,900 were electronically transferred into Subject Account 1.  Prior to this deposit, the balance in the account was $3,600.

29.   On or about August 25, 2020, proceeds from the PPP loan of $384,100 were electronically transferred into Subject Account 1.  Prior to this deposit, the balance in the account was $118,920.31, consisting primarily of the EIDL loan proceeds.  The fraudulent PPP and EIDL loan proceeds deposited into Subject Account 1 totaled $534,000.

30.   As detailed below, a total of $196,000 was subsequently transferred from Subject Account 1 to Subject Account 2, and $23,000 was transferred from Subject Account 1 to Subject Account 3.  Further, $20,000 was subsequently

---

[1] N. Terabelian is Terabelian's father who died on July 18, 2020.

transferred back from Subject Account 2 to Subject Account 1, and $20,000 was transferred back from Subject Account 3 to Subject Account 1.  This results in net fraudulent loan proceeds in Subject Account 1 totaling $355,000.

**Fraudulent Loan Proceeds Deposited into Subject Account 2**

31.  Investigators obtained and reviewed records from Chase for Subject Account 2 and learned that this account was opened on or about July 10, 2020, which was less than one month prior to applying for both the PPP and EIDL loans.  The only signatory on the account was Zhadko.

32.  Subsequent to the deposit of the PPP and EIDL loan proceeds into Subject Account 1, fraudulent loan proceeds were transferred from Subject Account 1 to Subject Account 2 in a series of transactions, as follows:

a.  On or about September 25, 2020, $11,000 was transferred, identified as "Turing Info Solu Payroll". This transfer consisted substantially of fraudulent loan proceeds;

b.  On or about December 21, 2020, $47,000 was transferred, which consisted substantially of fraudulent loan proceeds;

c.  On or about December 22, 2020, $86,000 was transferred, which consisted substantially of fraudulent loan proceeds;

d.   On or about December 30, 2020, $52,000 was transferred, which consisted substantially of fraudulent loan proceeds; and

e.   On or about January 25, 2021, $20,000 was transferred back from Subject Account 2 to Subject Account 1.  This resulted in net transfers of fraudulent loan proceeds from Subject Account 1 to Subject Account 2 totaling $176,000.  No funds from any other sources were deposited into Subject Account 2 during this time.

33.  As detailed below, a total of $165,000 was subsequently transferred from Subject Account 2 to Subject Account 3, and $48,000 was subsequently transferred back from Subject Account 3 to Subject Account 2.  This results in net fraudulent loan proceeds in Subject Account 2 totaling $59,000.

**Fraudulent Loan Proceeds Deposited into Subject Account 3**

34.  Investigators obtained and reviewed records from Ameritrade for Subject Account 3 and learned that this account was opened on or about December 21, 2020.  The only signatory on the account was Zhadko.

35.  Subsequent to the deposit of the PPP and EIDL loan proceeds into Subject Account 1, and the subsequent transfers of fraudulent loan proceeds from Subject Account 1 to Subject Account 2, a series of transactions resulted

in fraudulent loan proceeds being transferred from Subject Account 2 into Subject Account 3, as follows:

a.   On or about December 21, 2020, $50,000 was transferred, which consisted substantially of fraudulent loan proceeds;

b.   On or about December 23, 2020, $75,000 was transferred, which consisted substantially of fraudulent loan proceeds;

c.   On or about December 31, 2020, $40,000 was transferred, which consisted substantially of fraudulent loan proceeds; and

d.   On or about January 22, 2021, $15,000 was transferred back from Subject Account 3 to Subject Account 2, and on or about January 25, 2021, $33,000 was transferred back from Subject Account 3 to Subject Account 2.  This results in net fraudulent loan proceeds in Subject Account 3 totaling $117,000. No funds from any other sources were deposited into Subject Account 3 during this time.  However, there may have been increases in the account value from investment returns.

**Fraudulent Loan Proceeds Deposited into Subject Account 4**

36.  Investigators obtained and reviewed records from Ameritrade for Subject Account 4 and learned that this

account was opened on or about July 29, 2020.  The only
signatory on the account was Zhadko.

37.  Subsequent to the deposit of the EIDL loan
proceeds of $149,900 into Subject Account 1 on August 12,
2020, $23,000 was transferred from Subject Account 1 to
Subject Account 4, also on August 12, 2020.  Prior to this
transfer, the balance in Subject Account 4 was $1,500.

38.  On or about January 25, 2021, $20,000 was
transferred back from Subject Account 4 to Subject Account
1.  This results in net fraudulent loan proceeds in Subject
Account 4 totaling $3,000.  No funds from any other sources
were deposited into Subject Account 4 subsequent to receipt
of the fraudulent loan proceeds.

## V.

## CONCLUSION

39.  The evidence set out in this affidavit
demonstrates that there is probable cause to believe that
Turing submitted fraudulent loan applications to financial
institutions and the SBA, in an attempt to obtain funds
authorized by the CARES Act.  Based on the fraudulent loan
applications submitted, Turing received proceeds of PPP and
EIDL loans which were either directly or indirectly
transferred to the Subject Accounts.

40.  Based on the foregoing, there is probable cause to believe that the Subject Funds constitute or were derived from proceeds traceable to one or more violations of 18 U.S.C. §§ 1343 (Wire Fraud) and 1344 (Bank Fraud), and are therefore subject to seizure pursuant to 18 U.S.C. § 981(b), and forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984.  In addition, there is probable cause to believe that the Subject Funds are subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. §§ 982(a)(7) and 21 U.S.C. 853(f), because the funds would, in the event of conviction on the alleged underlying offenses, be subject to criminal forfeiture, and an order under section 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the property for forfeiture.

_____

Geffrey Clark
Special Agent
IRS-Criminal Investigation

Subscribed and sworn to before me
this   th day of February, 2021

_____

HONORABLE JACQUELINE CHOOLJIAN
UNITED STATE MAGISTRATE JUDGE